BETH LABSON FREEMAN, United States District Judge
More than two million people apply for positions at Google each year, making Google's hiring process as daunting as that of an Ivy League school.[1] This case involves approximately 265 applicants who were ages 40 and older when they interviewed in-person for certain engineering positions at Google and were denied employment. Rather than simply losing the numbers game, Plaintiffs allege that Google's hiring process systematically discriminates against applicants ages 40 and older in violation of the federal Age Discrimination in Employment Act ("ADEA"). The question before the Court is whether these applicants are "similarly situated" under the relevant law such that they may proceed collectively in pursuit of their disparate treatment age discrimination claims against Google.
The Court held a hearing on Google's motion to decertify on July 12, 2018. Having considered the briefing, oral argument, evidentiary record, and applicable law, the Court finds that Plaintiffs have put forth substantial evidence to demonstrate that they are similarly situated. For the reasons that follow, Google's motion to decertify the collective action is DENIED.
I. BACKGROUND
A. Procedural History
Defendant Google LLC ("Google") is a global technology company that began as a search engine and has expanded into other areas of software, hardware, and cloud computing. Google's parent company as of October 2015, Alphabet Inc., has a workforce of over 85,000 employees. See Alphabet Announces First Quarter 2018 Results, Press Release, (April 23, 2018), available *1159 at: https://abc.xyz/investor/pdf/2018Q1_alphabet_earnings_release.pdf. On April 22, 2015, Plaintiff Robert Heath ("Heath") initiated this action on behalf of himself and others similarly situated alleging age discrimination against Google under the ADEA and the California Fair Employment and Housing Act ("FEHA").See Complaint ("Compl."), ECF 1. Heath alleged that Google failed to hire him when he applied for a software engineer position at age 60 despite Heath's "highly-pertinent qualifications and experience" and notwithstanding a Google recruiter deeming Heath a "great candidate." Id. ¶ 3.
In the original Complaint, Heath alleged that through its hiring and employment practices, Google engages in a pattern and practice of intentional employment discrimination against individuals who are age 40 and older. Id. ¶ 50. Among other allegations, Heath pointed out that Google's workforce had a median age of 29 years old as of 2013. Id. ¶ 2. In contrast, workforce statistics from the United States Department of Labor in 2013 indicated a median age of 42.4 years for all U.S. workers. As discussed below, Plaintiffs rely on statistics to support their argument that Google disproportionately fills a large percentage of its workforce with individuals under the age of 40 even though many individuals over 40-such as the class members in the instant suit-are available and well-qualified for the positons. Id. ¶ 50.
In addition to an intentional discrimination or "disparate treatment" claim under the ADEA, the original Complaint alleged an ADEA disparate impact claim. Id. ¶ 52. Google moved to dismiss the Complaint on June 11, 2015, ECF 16,[2] and in response, Heath filed a First Amended Complaint as of right. ECF 18 ("FAC"). The FAC omitted any allegations concerning a Rule 23 class claim under FEHA, and also voluntarily withdrew the disparate impact claim under the ADEA. Id. Further, Cheryl Fillekes ("Fillekes"), a 47-year-old engineering candidate, joined the case as a named plaintiff. Id. ¶¶ 1, 8, 32-48. Google answered the FAC and the case proceeded through discovery. ECF 21. Heath subsequently sought leave to file a second amended complaint to re-assert his FEHA age discrimination claim as a class action, which Google opposed. ECF 65, 67. The Court denied Heath's motion on July 29, 2016, reasoning that Heath made no showing of diligence as required to show "good cause" under Federal Rule of Civil Procedure 16. ECF 93.
On October 5, 2016, the Court granted Fillekes' motion to conditionally certify an ADEA collective action and denied Heath's motion for partial joinder. See ECF 119. The Court conditionally certified Fillekes' proposed collective action consisting of:
All individuals who interviewed in-person for any Software Engineer ("SWE"), Site Reliability Engineer ("SRE"), or Systems Engineer ("SYSEng") position with Google in the United States who were age 40 or older at the time of the interview; and were refused employment by Google; and received notice that they were refused employment during the time period from August 28, 2014 through October 5, 2016.
Id. at 8; ECF 121 at 6.[3] Heath objected to Fillekes' proposed class because it excluded *1160 him: Heath only received a phone interview rather than an on-site interview before he was rejected. Id. at 11. Thus, Heath proposed a much broader class that the Court declined to certify. Id. at 11. In its denial, the Court explained that "Heath's vast class would include every individual applicant over the age of 40 without regard to their qualifications, including, for example, a lawyer applying for a software engineer position. Common sense dictates that Google would have rejected those individuals based on their lack of qualifications, not their age." Id. at 14.
Accordingly, this action proceeded as a conditionally certified collective action with Fillekes as a representative, and Heath remains in this case only as to his individual claims.[4] On December 12, 2016, the Court approved the Opt-In Notice and Consent to Join forms for Fillekes' conditionally certified collective action. ECF 126. Notice was sent to 4,270 individuals and 265 opted in at the time of decertification briefing. See Declaration of Brian D. Berry ("Berry Decl.") ¶ 2, ECF 252-1. The parties then engaged in vast discovery on both sides, including deposing 34 Opt-In Plaintiffs, deposing Google's Rule 30(b)(6) witness, and propounding written discovery on Google as well as on 75 randomly-selected Opt-Ins.
Meanwhile, on August 1, 2017, Fillekes and the Opt-In Plaintiffs moved for leave to file a second amended complaint ("SAC") in which they sought to re-allege an ADEA disparate impact claim based on recent district case law indicating that applicants as well as employees had standing to bring a disparate impact claim. See ECF 187. Google opposed the motion, but the Court granted Plaintiffs leave on the grounds that "[w]hether applicants may allege disparate impact claims under the ADEA is a novel question in the Ninth Circuit, and the parties were limited in their briefing on the issue in the context of Plaintiffs' motion for leave to amend." ECF 219 at 4. Rather than deem Plaintiffs' disparate impact claim futile under Federal Rule of Civil Procedure 15, the Court found that the issue warranted full briefing on the merits in the context of a motion to dismiss the disparate impact claim. Id.
On September 11, 2017, Plaintiffs filed the Second Amended Complaint ("SAC") in the record. ECF 218. Google moved to dismiss the disparate impact claim, ECF 227, and the Court held a hearing on January 11, 2018. The Court granted Google's motion to dismiss the disparate impact claim with prejudice, finding that Fillekes waived her disparate impact claim by failing to re-plead it in the FAC after it was voluntarily withdrawn over two years ago. ECF 235. Accordingly, the Court did not reach the issue of whether the ADEA authorizes disparate impact claims brought by applicants for employment along with employees. Id. On January 26, 2018, Google answered the SAC. ECF 237.
Google now moves to decertify the collective action on the grounds that the collective, whose members allege a single cause of action for intentional age discrimination under the ADEA, are not "similarly situated." See ECF 252 ("Mot."); see also 29 U.S.C. § 216(b). Plaintiffs oppose, arguing that the Plaintiffs are similarly situated and decertification would be improper in this pattern-or-practice case under the framework set forth in Int'l Bhd. of Teamsters v. United States , 431 U.S. 324, 360-61, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). See ECF 258 ("Opp'n"). The Court held a *1161 hearing on Google's motion to decertify on July 12, 2018.
As motions for decertification come at the end of discovery with a well-developed evidentiary record, the Court begins with an overview of the evidence pertaining to Google's hiring practices and the experiences of the Plaintiffs. The Court then turns to its analysis of the commonly adopted Leuthold factors to determine whether Plaintiffs are similarly situated pursuant to § 216(b). See Leuthold v. Destination Am. , 224 F.R.D. 462 (N.D. Cal. 2004).
B. Google's Hiring Process
Google hires technical employees by relying on feedback from numerous Google engineers in a multi-stage process. See Declaration of Brian Ong ("Ong Decl.") Exh. 249-5 ¶ 16. The first step after resume review is for a candidate to pass an initial phone screen. Only [redacted] of all technical applicants are contacted by a Google recruiter for an initial phone screen. See Kotchen Decl. Exh. 2 at 10. Once a candidate passes the initial screen, the next step is a Technical Phone Screen ("TPS") where the candidate is asked to write code, formulate algorithms, and/or answer substantive questions. Ong Decl. ¶¶ 18-19. Approximately [redacted] of applicants move on to the TPS. Kotchen Decl. Exhs. 2, 8.[5] TPS interviewers then submit their interview scores, comments, and notes in Google's internal applicant tracking system: gHire. Ong Decl. ¶ 19.
If the candidate passes the TPS, he or she is typically invited to on-site interviews at Google to meet separately with [redacted] engineers. Id. ¶ 20. Roughly [redacted] of all applicants make it to the on-site interview stage. Kotchen Decl. Exh. 2 at 10. Following the on-site interviews, each Google engineer enters feedback about the candidate in gHire, [redacted] Ong Decl. ¶ 21. If the feedback indicates a [redacted]," then the candidate may be rejected or encouraged to apply and re-interview for a different position. Id. ¶ 22. If the feedback indicates "[redacted] the recruiter normally advances the candidate to review by a Hiring Committee. Id. Approximately [redacted] of applicants make it to the Hiring Committee. Kotchen Decl. Exh. 2 at 10.
Google has numerous Hiring Committees [redacted] come [redacted] Ong Decl. ¶ 23. Hiring Committees for SWE, SRE, and SysEng positions are usually comprised of [redacted] engineers with relevant engineering and interview experience. Id. ¶ 24. The Hiring Committee members have never met the candidates and base their reviews on the candidate's "dossier." Id. Each candidate's "dossier" is a compilation of a candidate's interview notes, internal referral notes, internal reference notes, and resume. Id. ¶ 5. The Hiring Committee members typically review the dossiers individually before meeting as a group, and then discuss the candidate at the meeting in light of their individual assessments. Id. ¶¶ 25-26. After deliberating, the Hiring Committee members vote on whether to recommend an offer of employment, to recommend bringing the candidate back for additional interviews, or to reject the candidate. Id. ¶ 26. The Hiring Committee also [redacted] Candidates who are recommended for hire proceed to a Pre-Review and ultimately a Final Review step. Id. ¶¶ 27-28. Throughout the various stages of this process, a candidate may skip or repeat a stage or start over completely.
*1162 Id. ¶ 17; see also Kotchen Decl. Exh. 8 at 22.
Plaintiffs allege that Google's multi-stage interview and hiring process discriminates against applicants ages 40 and older in violation of the ADEA. See generally SAC. Specifically, Plaintiffs argue that Google intentionally discriminates against older workers by: (1) collecting age-related data from applicants, which allows interviewers and senior staff to estimate applicants' ages; (2) emphasizing abstract, theoretical interview questions of the type currently taught and tested in school, which Google interviewers themselves admit favor recent graduates; (3) discounting real-world experience; (4) using higher standards for older, more "senior" applicants than are used for younger applicants for the same positions; and (5) emphasizing "Googleyness" or "cultural fit," which Plaintiffs allege is effectively a euphemism for youth. SAC ¶ 3.
According to Plaintiffs, these five aspects of Google's alleged discriminatory hiring process work in combination to disadvantage applicants for technical positions ages 40 and older. The exhibits and depositions attached to the parties' briefing show evidence related to each of these five aspects of the allegedly discriminatory practice. First, Plaintiffs point to evidence that in 2015, Google began requesting applicants to disclose the start and end dates for their educational history on their application forms prior to attending an on-site interview. Compare Declaration of Daniel Kotchen ("Kotchen Decl."), ECF 258-1, Exh. 11, with Kotchen Decl. Exh 12. Moreover, several Opt-In Plaintiffs testified at their depositions that Google recruiters specifically asked them to disclose their graduation and employment dates. See, e.g. , Kotchen Decl. Exh. 17 (Google recruiter e-mail to applicant on July 23, 2016 stating: "Need start and end dates for University(ies) attended AND all companies you've worked - be sure to include month and year."); see also Kotchen Decl. Exh. 19 (Google recruiter e-mail to applicant on October 16, 2015 asking: "What years did you attend college?").[6]
Second, Plaintiffs provide evidence that Google's on-site interviewers focus on abstract and theoretical questions that-by the interviewers' own admissions-favor recent graduates with recent classroom experience. For example, one interviewer commented that the problem posed to the applicant was "[redacted] [The applicant] is clearly far removed from this environment." Kotchen Decl. Exh. 27 at 14. The interviewer went on to opine: "I personally succeeded at interviewing for a position at Google when I was fresh out of grad school. If I were to be interviewed today, five years later, I'm not confident that I would fare as well." Id.
Third, Plaintiffs provide evidence from several Opt-In deposition transcripts and discovery responses indicating that Google interviewers discount real world experience by not asking questions (or asking cursory questions) to the majority of applicants about their prior work experience or skillset. See Compilation Exhibit C, ECF 257-10, Exhs. C1-C53.[7] For example, one Opt-In recalled: "While I had over 18 years of professional experience in the embedded industry at the time of my interview, *1163 the interviewers' questions did not relate to my work experience, and did not take into consideration my work history." Compilation Exhibit C12 at 1. Another Opt-In explained: "A number of questions were unrelated to the position at issue ... and did not touch on my almost thirty years of professional experience in the industry. I felt that these interview questions did not take into consideration my work history or skill set, and were not related to my suitability for the position." Id. Exh C23.
Fourth, the Opt-Ins testified that they felt Google held them to a higher standard because of their age, evidenced by interviewers asking older applicants more difficult interview questions, requiring more polished technical answers, and considering older applicants for higher-level job positions only. See Compilation Exhibit D, ECF 257-11; Compilation Exhibit F, ECF 257-15. Fifth and finally, Plaintiffs provide evidence that certain Opt-Ins were rejected based on their lack of "Googleyness" or "cultural fit," which Plaintiffs argue is effectively a euphemism for youth. See Compilation Exhibit E, ECF 257-14. As one Opt-In Plaintiff recalls following the on-site interview, the recruiter "informed me that I was not a good fit for the Software Engineer position and that the hiring committee had rejected my candidacy." Id. Exh. E3 at 2.
In contrast, Google argues that the evidence shows that the only corporate policy in evidence is Google's "Equal Employment Opportunity Policy" that prohibits employment discrimination of any kind, including age discrimination. See Declaration of Brian D. Berry ("Berry Decl."), ECF 252-1, Exh. 42. Google's Rule 30(b)(6) witness further testified that Google trains interviewers and Hiring Committee members on conscious and unconscious bias. See id. Exh 44 at 76:9-18, 86:6-87:5, 101:11-102:1.
The record indicates that Google makes offers to only [redacted] of candidates who receive on-site interviews. See Expert Report of Dr. John Johnson at 4, 12 ("Johnson Report") Berry Decl. Exh. 43. However, Plaintiffs present statistical evidence that their expert opines is strongly consistent with age discrimination. See Expert Report of Dr. David Neumark ("Neumark Report"), Kotchen Decl. Exh. 21. Plaintiffs' expert report indicates that during the relevant period, [redacted] of younger applicants who received on-site interviews at Google received job offers. Id. ¶¶ 7, 36. Only [redacted] of older applicants who interviewed on-site during the Class Period received offers. Id. This results in a statistically significant disparity of [redacted] standard deviations. Id. The statistical likelihood that such a disparity is due to chance is less than [redacted] Id. In addition, Plaintiffs' expert used Google's data to show t[redacted] Id. ¶ 9 (explaining that statistical analysis "shows a negative effect of experience on the probability of a job offer.") Plaintiffs further point to national statistics to support their position that Google's workforce with a median age of 29 is "grossly disproportionate" to the labor market for the relevant IT services. See Opp'n at 5; SAC ¶ 28.
C. Plaintiffs' Experiences
As discussed at length in this Court's prior order conditionally certifying Fillekes' proposed class, Plaintiffs in this case are technical candidates for SWE, SRE, or SysEng positions at Google who were age 40 or older at the time of their on-site interviews and received notice that they were refused employment by Google between August 28, 2014 and October 5, 2016. See ECF 119, ECF 121. Plaintiffs present evidence that these three engineering positions share similar and overlapping *1164 job responsibilities, such as writing code and troubleshooting/problem solving. See Kotchen Decl. Exhs. 3-7. Moreover, Plaintiffs were all among the [redacted] of applicants to make it to the on-site interview stage. Fillekes herself interviewed with Google on four separate occasions and although she reached the in-person interview stage each time, she never received an employment offer. ECF 119 at 2. In contrast, Google rejected Heath, who is not a member of the conditionally certified collective, after a phone interview. Id. at 2-3. This Court declined to certify Heath's proposed collective of all technical applicants age 40 and older because it would have included an unknown number of "applicants" who demonstrated no plausible qualifications for the job. Id. at 11-14.
After their on-site interviews for technical positions at Google, Plaintiffs were each denied employment. Google submits evidence that [redacted] of the Plaintiffs made it to the Hiring Committee before they were rejected while the remainder never advanced to the Hiring Committee stage. See Johnson Report at 21-22. In moving for decertification, Google points to differences in the interview experience and evaluation of each candidate to show that Plaintiffs' factual allegations and legal claims, as well as Google's defenses, are unique as to each Opt-In Plaintiff and must be tried individually. See, e.g. , Mot. at 3-7. Plaintiffs argue that the evidence shows sufficient similarities such that this litigation should proceed as a collective action. See generally Opp'n. The Court discusses the evidentiary record as it pertains to the individual Plaintiffs in connection with the legal framework below.
II. LEGAL STANDARD
The ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The Act further provides that it is to be enforced "in accordance with the powers, remedies and procedures" of designated sections of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203 et seq. 29 U.S.C. § 626(b). Plaintiffs previously moved for conditional certification of a collective action as prescribed by FLSA § 216(b), which provides, in pertinent part: "An action... may be maintained against any employer...in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).
The statute does not define the term "similarly situated," and the Ninth Circuit has yet to interpret this phrase. See Leuthold v. Destination America , 224 F.R.D. 462, 467 (N.D. Cal. 2004) ; see also Hernandez v. United Auto Credit Corp. , No. C-08-03404 RMW, 2010 WL 1337702, at *2 (N.D. Cal. Apr. 2, 2010). As the Tenth Circuit noted, there is little circuit law defining "similarly situated." Thiessen v. Gen. Elec. Capital Corp. , 267 F.3d 1095, 1102 (10th Cir. 2001). Therefore, to determine whether collective action members are "similarly situated," courts engage in a "two-step approach involving initial notice to prospective plaintiffs, followed by a final evaluation whether such plaintiffs are similarly situated." Leuthold , 224 F.R.D. at 467. First, courts apply a lenient standard to determine whether the ADEA proposed collective action should be conditionally certified and given notice. See Adams v. Inter-Con Sec. Systs., Inc. , 242 F.R.D. 530, 535-36 (N.D. Cal. 2007) ; see also Thiessen , 267 F.3d at 1102. In this case, the Court found that step-one was satisfied and conditionally certified the collective action on October 5, 2016. ECF 118.
*1165 At step two of the inquiry, "the party opposing the certification may move to decertify the class once discovery is complete." Adams , 242 F.R.D. at 536 (citation omitted); Escobar v. Whiteside Const. Corp. , No. C 08-01120 WHA, 2008 WL 3915715, at *3 (N.D. Cal. Aug. 21, 2008) ("Certification is called 'conditional' during the first stage because the opposing party could always (successfully) move for decertification."). It is at the second stage that the Court makes a factual determination about whether the plaintiffs are actually similarly situated. Google has moved to decertify and as such, this case has reached the second step of the process. Accordingly, the Court may decertify the class if it concludes that the class members are not similarly situated. If the class is decertified, the Court may dismiss the opt-in plaintiffs without prejudice. Leuthold , 224 F.R.D. at 467.
To overcome a motion to decertify a conditionally certified class, "it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated." Reed v. County of Orange , 266 F.R.D. 446, 449 (C.D. Cal. 2010). At this second stage, "[l]ogically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." Anderson v. Cagle's Inc. , 488 F.3d 945, 953 (11th Cir. 2007). Courts consider three factors in deciding whether plaintiffs have met their step-two burden. Reed , 266 F.R.D. at 449. "These factors include: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." Beauperthuy v. 24 Hour Fitness USA, Inc. , 772 F.Supp.2d 1111, 1118 (N.D. Cal. 2011).
At this stage, plaintiffs "need show only that their positions are similar, not identical, to the positions held by the putative [collective action] members." Hipp v. Liberty Nat'l Life Ins. Co. , 252 F.3d 1208, 1217 (11th Cir. 2001). "A requirement that the class members be identical would be inconsistent with the intent of FLSA's provision that a case can proceed as a collective action." Hernandez , No. C-08-03404 RMW, 2010 WL 1337702, at *2. Accordingly, even at this second stage, the standard applied remains distinct from and easier to satisfy than the requirements for a class action certified under Federal Rule of Civil Procedure 23(b)(3). See Lewis v. Wells Fargo & Co. , 669 F.Supp.2d 1124, 1127 (N.D. Cal. 2009).
III. DISCUSSION
Google argues that based on the record before the Court, Plaintiffs cannot meet their burden of showing that they are similarly situated and the ADEA collective must be decertified. See Mot. at 8. Plaintiffs oppose, arguing that the evidence suffices to show that they are similarly situated. See Opp'n at 10. In particular, Plaintiffs represent that they are proceeding as a Teamsters pattern-or-practice case and that the Court must apply the Teamsters burden-shifting framework to their ADEA claims. Id. Google argues that Plaintiffs' opposition mischaracterizes the legal standard required by § 216(b). See Reply at 1, ECF 300-3.
The Court agrees with Google that simply invoking the Teamsters framework does not absolve Plaintiffs of their burden to show that they are similarly situated. Plaintiffs must still put forth substantial evidence to satisfy the Leuthold factors. However, the Court would be remiss to ignore the two-phase approach under the Teamsters framework in evaluating the Leuthold factors. In particular, the Court must consider what evidence would be offered *1166 at phase one and phase two of a Teamsters trial in considering whether collective adjudication is fair and manageable. Ultimately, the Court finds that Google emphasizes differences that largely apply to phase two of a Teamsters trial, or go to the merits of the dispute and are more appropriate for summary judgment.
As discussed at the July 12, 2018 hearing, the parties have presented the Court with polarizing alternatives: to accept Google's argument would result in decertification in every instance, whereas to accept Plaintiffs' position would permit every Teamsters case to defeat decertification. For the reasons that follow, the Court concludes that the answer lies somewhere in between.
A. Teamsters Framework
Before turning to the Leuthold factors, the Court addresses Plaintiffs' argument that the Court should apply the Teamsters burden-shifting framework to this ADEA case. Plaintiffs' disparate treatment theory is that Google engages in a systematic pattern-or-practice of discriminating against applicants age 40 and older in violation of the ADEA by instituting a hiring process that knowingly and intentionally treats older individuals adversely while treating younger individuals preferentially, and disproportionately filling its workforce with younger individuals when there are many individuals age 40 and older who are available and well-qualified for the positions. See SAC ¶¶ 1, 60, 62-66. Neither the Supreme Court nor the Ninth Circuit has addressed whether pattern-or-practice claims apply in ADEA collective actions. Thus, Google argues that pattern-or-practice claims are not cognizable under the ADEA and, even if Teamsters were applicable, it "is not relevant at decertification." Mot. at 24.
In Thiessen v. Gen. Elec. Capital Corp. , the Tenth Circuit held that the district court had erred in decertifying an ADEA collective where the plaintiffs were asserting a Teamsters pattern-or-practice claim. 267 F.3d 1095, 1107 (10th Cir. 2001). The Tenth Circuit explained that "[p]attern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination." 267 F.3d at 1106. That is because cases involving claims of individual discrimination focus on the reasons for the particular employment decision at issue while a pattern-or-practice case focuses on "a pattern of discriminatory decisionmaking." Id. The Supreme Court in Teamsters set out a framework for the order and allocation of proof as well as the trial proceedings in a pattern-or-practice case in the context of Title VII. 431 U.S. at 357-62, 97 S.Ct. 1843.
Under the Supreme Court's Teamsters framework, pattern-or-practice claims are evaluated in two phases, known as the "liability stage" ("Phase One") and the "remedial stage" ("Phase Two"). See Buchanan v. Tata Consultancy Servs., Ltd. , No. 15-CV-01696-YGR, 2017 WL 6611653, at *11 (N.D. Cal. Dec. 27, 2017) (citing Teamsters , 431 U.S. at 360, 97 S.Ct. 1843 ). During Teamsters phase one, the burden is on Plaintiffs "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." 431 U.S. at 360, 97 S.Ct. 1843. Plaintiffs must show that intentional discrimination was the defendant's "standard operating procedure" as opposed to an "unusual practice." Id. at 336, 97 S.Ct. 1843. To carry their burden, Plaintiffs must produce evidence giving rise to a sufficient "inference that employment decisions were based on an unlawful discriminatory criterion." Buchanan , 2017 WL 6611653, at *12. Plaintiffs can establish *1167 this inference through circumstantial evidence such as statistical disparities, documents, and testimony from protected class members. Id. (citing Teamsters , 431 U.S. at 336, 97 S.Ct. 1843 ); see also American Federation of State, County & Mun. Employees, AFL-CIO (AFSCME) v. State of Wash. , 770 F.2d 1401, 1407 (9th Cir. 1985) ("We have recognized that in certain cases an inference of intent may be drawn from statistical evidence.")
At phase one of a pattern-or-practice case, Plaintiffs are "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." Teamsters , 431 U.S. at 360, 97 S.Ct. 1843. Rather, Plaintiffs' burden "is to establish a prima facie case that such a policy existed." Id. "The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." Id.
"If an employer fails to rebut the inference that arises from the [plaintiffs'] prima facie case," the finder of fact can conclude "that a violation has occurred" and the trial court can award prospective equitable relief. Id. at 361, 97 S.Ct. 1843. If Plaintiffs also seek "individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." Id. It is only in this second phase that the court determines whether each individual plaintiff was a victim of the discriminatory practice. Once the case reaches the remedial phase, Plaintiffs are entitled to an "inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." Teamsters , 431 U.S. at 361, 97 S.Ct. 1843 ; Thiessen , 267 F.3d at 1106-07, fn.7 (finding that at phase two, ADEA plaintiffs are "entitled to a presumption that the employer had discriminated against them").
The Tenth Circuit's decision in Thiessen examined this interplay between the Teamsters framework and a motion to decertify in an ADEA collective action. There, the plaintiffs alleged that defendants had an express but covert "blocker policy" that discriminated against older white employees by forcing them into early retirement because it was defendant's view that these employees were "blocking" the advancement of younger employees. 267 F.3d at 1100. The district court granted the defendant's motion to decertify based on the ad hoc approach to determining whether the plaintiffs were "similarly situated" for purposes of § 216(b). Id. at 1103. However, the district court failed to recognize that the plaintiffs were proceeding under a pattern-or-practice theory. Id. at 1106-08. The Tenth Circuit found that this was error and reversed, holding that "[w]hen an ADEA plaintiff relies upon a 'pattern or practice' theory and comes forward with legitimate evidence to support that theory, the district court must take into account the framework for pattern-or-practice cases outlined by the Supreme Court in [ Teamsters ]." Id. at 1108 ; see also Equal Employment Opportunity Comm'n v. Sandia Corp. , 639 F.2d 600, 623 (10th Cir. 1980) ; Thompson v. Weyerhaeuser Co. , 582 F.3d 1125, 1128-29 (10th Cir. 2009).
Several other Circuits have similarly concluded that the Teamsters framework applies to ADEA cases. See Hipp v. Liberty Nat'l Life Ins. Co. , 252 F.3d 1208, 1227 (11th Cir. 2001) ; King v. Gen. Elec. Co. , 960 F.2d 617, 624 (7th Cir. 1992) (finding that although the ADEA has no parallel provision to Title VII's 42 U.S.C. § 2000e-6(a), "courts nevertheless have adopted the *1168 pattern-or-practice terminology and the shifting burden of persuasion to ADEA actions"); Haskell v. Kaman Corp. , 743 F.2d 113, 119 (2d Cir. 1984) ("As in race discrimination cases, a plaintiff [in an ADEA case] may through statistical evidence establish a pattern or practice of discharging or failing to promote older employees, from which an inference of age discrimination may be drawn."); EEOC v. W. Elec. Co. , 713 F.2d 1011, 1016 (4th Cir. 1983) ; Marshall v. Sun Oil Co. , 605 F.2d 1331, 1336 n. 2 (5th Cir. 1979).
Google does not engage with these cases in its briefing but maintains its position that Teamsters does not apply to ADEA cases. See Reply at 13. Specifically, Google argues that applying the Teamsters framework-which shifts the burden of persuasion to the employer in stage two-would directly conflict with the Supreme Court's holding in Gross v. FBL Fin. Servs., Inc. , 557 U.S. 167, 177-78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) that ADEA disparate-treatment plaintiffs bear the burden of persuasion on "but for" causation at all times. Mot. at 24. But Google makes this argument in passing and does not cite to any case holding that it is improper for the Court to apply Teamsters to an ADEA case. In contrast, Plaintiffs have presented ample authority that "[t]he pattern-or-practice framework has been widely applied to ADEA cases." Thompson , 582 F.3d at 1127. The Tenth Circuit also explicitly rejected the argument put forth by Google, ruling that "in our view, the Supreme Court's decision in Gross does not overrule circuit precedent that authorizes the application of the pattern-or-practice framework in ADEA cases." Id. at 1131. Significantly, Gross involved individualized discrimination and was not a collective action. See 557 U.S. 167, 129 S.Ct. 2343. The Supreme Court therefore did not face the pattern-or-practice allegations at issue in this case.
Accordingly, the Court finds that it is in good company permitting Plaintiffs to proceed under a Teamsters framework and Google has not persuaded the Court that Plaintiffs are prohibited from doing so. Although the Ninth Circuit has not squarely addressed the application of a Teamsters framework in ADEA cases, the Court is satisfied that nothing in Ninth Circuit precedent would preclude adoption of the Teamsters approach as endorsed by the Tenth Circuit in Thiessen along with the Second, Fourth, Fifth, Seventh and Eleventh Circuits as discussed above. However, the Court is in complete agreement with Google that Teamsters is not a free pass on decertification. Mot. at 25. The Court therefore rejects Plaintiffs' legally unsupported argument that "the requisite nexus holding Plaintiffs' claims together is established based on the pattern-or-practice nature of the claims alone." Opp'n at 12-13. Thiessen clearly warns against this conclusion: "We do not hold that whenever there is evidence of a pattern-or-practice, a class must be certified. Whether certification or decertification is appropriate depends upon application of the factors we have identified in the ad hoc approach." 267 F.3d at 1108. Accordingly, the Court considers Plaintiffs' pattern-or-practice claims under Teamsters in its evaluation of the relevant factors to determine whether Plaintiffs are similarly situated.
B. The Leuthold Factors
To overcome Google's motion to decertify, Plaintiffs have the "burden to provide substantial evidence to demonstrate that they are similarly situated." Reed , 266 F.R.D. at 449. There is virtually no guidance from the Supreme Court or Ninth Circuit on what is required to demonstrate that a collective is "similarly situated."
*1169 Thiessen , 267 F.3d at 1102 ("Unfortunately, § 216(b) does not define the term "similarly situated," and there is little circuit law on the subject.") The Court therefore considers the three factor approach applied by district courts to determine whether Plaintiffs have met their burden: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." Leuthold , 224 F.R.D. at 467 ; see also Beauperthuy , 772 F.Supp.2d at 1118.
1. Factual and Employment Settings
Google argues that the factual circumstances involving each Plaintiff are so disparate that the first Leuthold factor alone requires decertification. See Mot. at 8-10; Reply at 3-13. "When determining whether a plaintiff has met its burden of producing substantial evidence to show that putative class members are similarly situated, the first factor courts consider is the degree of similarity among plaintiffs' factual and employment settings." Beauperthuy , 772 F.Supp.2d at 1122. "The first factor of the decertification analysis involves an assessment of whether Plaintiffs have provided evidence of a company-wide policy which may violate the [ADEA]." Rawls v. Augustine Home Health Care, Inc. , 244 F.R.D. 298, 300 (D. Md. 2007) (citing Thiessen v. General Elec. Capital Corp. , 996 F.Supp. 1071, 1081-82 (D. Kan. 1998) ); see also Marroquin v. Canales , 236 F.R.D. 257, 260 (D. Md. 2006) ("A group of potential plaintiffs are 'similarly situated' when they together were victims of a common policy or scheme or plan that violated the law."); accord Jackson v. New York Tel. Co. , 163 F.R.D. 429, 431 (S.D.N.Y. 1995) (holding that Plaintiffs are similarly situated under ADEA when "putative class members were together the victims of a single decision, policy or plan infected by discrimination.")
In addition, under the first factor, "[c]ourts look at whether plaintiffs had differing job titles or duties, worked in different geographic locations, worked under different supervisors, or allege different types of violative conduct." Santiago v. Amdocs, Inc. , No. C 10-4317 SI, 2013 WL 5444324, at *4 (N.D. Cal. Sept. 30, 2013) (citing Reed , 266 F.R.D. at 449 ). The greater the variation among Plaintiffs' factual settings, the less manageable a collective action becomes. See Benedict v. Hewlett-Packard Co. , No. 13-CV-00119-BLF, 2016 WL 3742342, at *6 (N.D. Cal. July 13, 2016). However, section § 216(b)'s "similarly situated" standard does not require that the experiences of members of a collective action be identical. See Sandoval v. M1 Auto Collisions Centers , No. 13-CV-03230-EDL, 2016 WL 6561580, at *6 (N.D. Cal. Sept. 23, 2016).
Plaintiffs argue that their factual and employment settings are similar in at least five ways: (1) Plaintiffs challenge the same employment practice; (2) Plaintiffs were all subject to the same standardized hiring process and criteria used by Google; (3) Plaintiffs were well-qualified for the technical positions they applied for; (4) Plaintiffs rely on common statistical evidence to show that they were discriminated against; and (5) Plaintiffs' employment situations are identical for purposes of phase one of a Teamsters trial and any dissimilarities among their employment situations are irrelevant at the liability phase. See Opp'n at 14-17. Google vehemently disagrees, and parses the discovery in an attempt to show how each Plaintiff's experience is so unique and dissimilar from the others such that their claims cannot be tried collectively. Mot. at 9-20.
First, the Court considers whether Plaintiffs have put forth substantial evidence *1170 that they are challenging the same " 'employment practice'-age discrimination in hiring." Opp'n at 13. "Weighing very strongly in favor of a collective action is the fact that the challenged employment practice ... is the same for each of the members." Rodolico v. Unisys Corp. , 199 F.R.D. 468, 483 (E.D.N.Y. 2001) (quoting Hyman v. First Union Corp. , 982 F.Supp. 1, 4 (D.D.C. 1997) ). The Court agrees with Google that the mere fact that each Plaintiff alleges a violation of the ADEA is insufficient to bind Plaintiffs together. However, Plaintiffs' second point is more nuanced: each of the Plaintiffs was subject to and challenges the same five allegedly discriminatory aspects of Google's hiring process for technical positions during the relevant period. Accordingly, the Court' analysis centers on Plaintiffs' evidence that there was such a pattern-or-practice such that Plaintiffs are similarly situated.
As discussed above, Plaintiffs have put forth substantial evidence that each candidate made it to the on-site interview stage and was subject to a hiring process that permitted interviewers to approximate their age, emphasized abstract, theoretical interview questions, discounted real-world experience, used higher standards for older applicants, and emphasized "Googleyness" or cultural fit. See, e.g. , Compilation Exhibits C, D, E, F. Further, it is undisputed that Plaintiffs were age 40 or older when they interviewed, that Google interviewers would have been able to observe Plaintiffs' ages at the in-person interviews, and that Google denied employment to each of the Plaintiffs after their in-person interviews.
Google goes to painstaking lengths to argue that the evidence of each Plaintiff's experience is individualized. By highlighting that Plaintiffs disavow experiencing at least one or more of Plaintiffs' five allegedly discriminatory practices, Google attempts to show that Plaintiffs cannot possibly be similarly situated. See Mot. at 11. By way of example, Google points out that the interviewers' assessments of each Plaintiff with respect to "Googleyness" or cultural fit is "all over the map." Mot. at 18. Fillekes herself received [redacted] Ong Decl. Exh. 14. Moreover, of the 15 Plaintiffs who testified that Google rejected them based on "cultural fit," the interview records show disparities about how each candidate was actually reviewed. Reply at 5 ("The interview records show that while some received negative reviews on Googleyness or cultural fitness, others received neutral or positive reviews.") According to Google, the Plaintiffs cannot be similarly situated with respect to "Googleyness" because less than half of the interviewers even asked questions going to this factor. Along similar lines, Google points to differing evidence on abstract or theoretical interview questions because some Plaintiffs testified that they performed well on technical questions and others were not even asked such questions at all. Mot. at 11-15. Google argues that the evidence shows that Plaintiffs' experiences differ with respect to the propriety of using technical interview questions at all, with some Plaintiffs admitting that they actually approve of using coding and algorithm questions and agree that such questions are job related. Id. at 13. Google presents numerous other examples of differences among each Plaintiff's interview experience.[8] By picking apart each of the *1171 five challenged aspects of the allegedly discriminatory hiring practice and attempting to map those alleged criterion to each Plaintiff, Google seeks to show that there is no "glue" binding Plaintiffs together "other than their age and this lawsuit." Id. at 15.
Google's entire argument on the first Leuthold factor is flawed because it assumes that Plaintiffs are proceeding on five separate theories of age discrimination, or that the case is dependent on an application of all five factors in each case. Instead, Plaintiffs premise their disparate treatment theory on Google's overarching "umbrella" hiring policy that encompasses at least five different components that combine to intentionally discriminate against older workers. Thus, even if the record shows that some Plaintiffs were ensnared by different filters than others, there is substantial evidence that Plaintiffs' experiences were similar because they were all subject to the same allegedly discriminatory scheme. Whether these five factors allegedly embedded in Google's hiring process were actually discriminatory and whether Google utilized them as its "standard operating procedure" are merits questions that are not before the Court at decertification. The Court's inquiry at decertification is limited to whether Plaintiffs have shown they are similarly situated and not whether Google actually has such a policy-an issue the Court expects that the parties will brief extensively in their dispositive motions. Nor are Plaintiffs required to show evidence of a "smoking gun" such as a memo from Google executives instructing interviewers to use the hiring criteria to eliminate older candidates. Although not as explicit as the blocker policy in Thiessen and the "strategic plan" to eliminate expensive older workers in reductions-in-force cases such as Vaszlavik v. Storage Tech. Corp. , 175 F.R.D. 672, 677, 679 (D. Colo. 1997), the Court finds that Plaintiffs here have still demonstrated substantial evidence of a common hiring plan with five components affecting all of them.
Moreover, because this is a pattern-or-practice case, whether each Plaintiff was "dinged" as a result of some aspect of the policy is actually a Teamsters phase two issue. As discussed above, during the "liability" stage of a pattern-or-practice case, Plaintiffs need not demonstrate that each of them was a victim of the discriminatory policy. Rather, Plaintiffs' burden at phase one "is to establish a prima facie case that such a policy existed." 431 U.S. at 360, 97 S.Ct. 1843. The Court is therefore not persuaded by Google's argument that decertification is warranted because Plaintiffs were not commonly subjected to any one of the five alleged practices, let alone all of them. See Reply at 11.
In particular, Google's reliance on Koren v. SUPERVALU, Inc. is unpersuasive. No. CIV.00-1479 ADM/AJB, 2003 WL 1572002, at *16 (D. Minn. Mar. 14, 2003). In Koren , the court held that the factual and employment settings of the plaintiffs required decertification because the plaintiffs "worked at different jobs in different business units located at different locations." Id. The Court respectfully disagrees with Koren 's non-binding decertification analysis, and finds that Google's evidence of geographic disbursement and the vast numbers of recruiters, interviewers, and Hiring Committee members involved does not warrant decertification under this factor.
*1172 See Mot. at 9. Although the Court credits that there were [redacted] different interviewers involved in Plaintiffs' hiring decisions, Plaintiffs have submitted evidence, if believed by a jury, demonstrating that these interviewers served to implement Google's standardized hiring process and criteria that resulted in the decision not to hire Plaintiffs. Combined with Plaintiffs' statistical evidence, discussed below, Plaintiffs have shown that they were similarly subject to Google's alleged intentional age discrimination enacted through a combination of the five challenged aspects of the hiring process.
Similarly, Google's emphasis on the differences among the three "job families" applied for (SRE, SWE, SysEng), job roles, and job levels (i.e. manager/non-manager), slice Plaintiffs' experiences too thinly. See Mot. at 9-10. Google even argues that Plaintiffs, who were all age 40 or older when they interviewed at Google, cannot proceed as a collective because they were different ages from each other when they applied. Id. at 10. The Court has previously considered Google's arguments and declined to certify Heath's proposed class at the conditional certification stage for several of these reasons in view of the distinctly different circumstances of Heath's denial of employment. To decertify Fillekes' collective action based on Google's view of the evidence would effectively prevent an ADEA collective action from ever seeing the courtroom.
Plaintiffs also provide evidence that they are similar because they are well qualified for the technical positions for which they applied. See Opp'n at 14; Kotchen Decl. Exh. 2 at 10. Unlike Heath who never made it beyond the phone interview, Fillekes and each Opt-In Plaintiff were among the approximately [redacted] of all applicants to pass both an initial phone screen and a technical phone interview and be invited to Google for an in-person interview. Id. Google argues that these similarities are over-stated because only [redacted] of those interviewed on-site ultimately receive offers. Reply at 12. Google further emphasizes that approximately [redacted] of the Opt-In Plaintiffs did not advance to the Hiring Committee after their interviews, while [redacted] made it to the Hiring Committee before they were rejected. Mot. at 9 (citing Johnson Report at 21-22). Once again, Google's dissection of the differences makes too fine a point. Plaintiffs' evidence of their qualifications supports a finding that there is "a meaningful nexus that binds Plaintiffs' claims together and that the similarities in their claims outweigh their differences." Falcon v. Starbucks Corp. , 580 F.Supp.2d 528, 540 (S.D. Tex. 2008) ; accord Sandoval , 2016 WL 6561580, at *6.
The Court also finds that Plaintiffs' common statistical evidence supports a finding that they are similarly situated. Plaintiffs point to the expert testimony of Dr. Neumark to show that Google discriminated against them. Dr. Neumark found a statistically significant disparity in offer rates between individuals age 40 and older who received on-site interviews compared to offer rates among individuals under 40. See Neumark Report ¶¶ 7, 36. Although Google's expert Dr. Johnson refutes Dr. Neumark's analysis in his own report, Google appears to concede that the dispute is a battle of the experts that the Court need not resolve at the certification stage. See, e.g. , Perez v. State Farm Mut. Auto. Ins. Co. , No. C 06-01962 JW, 2011 WL 8601203, at *5 (N.D. Cal. Dec. 7, 2011) (holding that at the certification stage "[t]he court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony.") Instead, Google argues that Dr. Neumark's statistical analyses are not tethered to Plaintiffs' actual claims and therefore *1173 his report does not move the needle on whether Plaintiffs' are similarly situated for trial. Reply at 14.[9]
In evaluating whether Dr. Neumark's findings are sufficiently tied to Google's allegedly discriminatory hiring practice, the Court declines Google's invitation to turn a blind eye toward Plaintiffs' statistics. The Court notes the remarkable difference of [redacted] between the offer rate for older job applicants compared to younger job applicants that received on-site interviews. Neumark Report ¶¶ 7, 36. The likelihood of observing a difference this large under age-neutral selection of applicants is less than [redacted] Id. To put these statistics in perspective, the Seventh Circuit has explained that "[t]wo standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not [age]-neutral." Adams v. Ameritech Servs., Inc. , 231 F.3d 414, 424 (7th Cir. 2000). The more standard deviations away-[redacted]-"the less likely the factor in question played no role in the decisionmaking process." Id. (emphasis added); see also Hazelwood Sch. Dist. v. United States , 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.") (citing Teamsters , 431 U.S. at 339, 97 S.Ct. 1843 ).
As Plaintiffs argued at the hearing, the statistics in this case are borne out by simply walking around Google's campus and seeing it filled with individuals in their 20s and 30s.[10] In conjunction with Plaintiffs' substantial anecdotal evidence discussed above, and without deciding the merits of Plaintiffs' claims, the Court finds that the statistics support Plaintiffs' assertion that they were similarly subject to Google's overarching hiring practices that favored younger workers. The Court comes to this conclusion taking into account that Plaintiffs assert a disparate treatment claim only, and Plaintiffs' prior abandonment of their disparate impact claims precludes them from repackaging their claims as intentional discrimination.[11]
For the foregoing reasons, and taking into account that Plaintiffs are proceeding under a Teamsters framework, the Court finds that the first Leuthold factor regarding Plaintiffs' factual and employment settings weighs against decertification. Google has meticulously drawn out differences that are largely irrelevant to phase one of a Teamsters ADEA trial. At the liability stage, Plaintiffs will seek findings that: Google engaged in a pattern-or-practice of age discrimination against applicants for SWE, SRE, and SysEng positions from August 28, 2014 to October 5, 2016; that Google acted willfully and wantonly; and that Plaintiffs are entitled to class-wide injunctive or declaratory relief. See Opp'n at 15; see also Vaszlavik v. Storage Tech. Corp. , 175 F.R.D. 672, 680 (D. Colo. 1997) ("The sole issue in the liability phase is whether defendant engaged in a pattern and practice of discrimination. At that stage, plaintiffs are not required to provide *1174 specific evidence that they were individually discriminated against.") (citing Teamsters , 431 U.S. at 361, 97 S.Ct. 1843 ). That Plaintiffs' interview experiences were not identical to one another and that they were not all subject to the same allegedly discriminatory aspect of the challenged policy does not negate Plaintiffs' substantial showing that they were similarly subject to Google's common hiring practice.
2. Available Defenses
The second Leuthold factor instructs the Court to consider "the various defenses available to the defendants with respect to the individual plaintiffs." Santiago , 2013 WL 5444324, at *4 (quoting Beauperthuy , 772 F.Supp.2d at 1122 ). The individualized defenses factor assesses whether any potential defenses pertain to the collective or whether the potential defenses require proof of individualized facts at trial. Thiessen , 996 F.Supp. at 1085 ; Rawls , 244 F.R.D. at 300. "However, individualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation." Sandoval , 2016 WL 6561580, at *9. Google argues that its defenses vary Plaintiff by Plaintiff. See Mot. at 20.
One of Google's defenses to Plaintiffs' intentional age discrimination claim will be that Google had legitimate, non-discriminatory reasons for not making an offer to each Plaintiff and therefore each Plaintiff cannot prove that age discrimination was the "but for" cause of his or her injury. Mot. at 20. Google points to the same evidence discussed above regarding Plaintiffs' interview experiences to demonstrate that Google has a valid, individualized defense for not hiring each Plaintiff. See Mot. at 20. As an example, Google may argue at trial that it chose not to hire certain candidates who did not prepare for the interview and performed poorly, while others were rejected because they lacked the desired skills. Id.
Google argues that several other potential defenses will require individualized proof at trial, including: (1) whether Google's technical interview questions are valid hiring criteria; (2) whether a "substantially younger" individual was chosen for non-generalist positions in comparison with the age of a particular Plaintiff who was not hired; (3) Google's backpay defenses which will vary because some Plaintiffs are highly-paid managers at other technology companies while others have not worked for years; and (4) whether Plaintiffs failed to mitigate because the evidence shows that some Plaintiffs withdrew their candidacy, others declined to interview when Google asked them to re-apply, and others did nothing to search for a job after applying to Google. See Mot. at 21-23. Accordingly, Google argues that a jury will have to hear from hundreds of witnesses and review thousands of documents including Fillekes and the Opt-In Plaintiffs' gHire dossiers and deposition transcripts. Id. at 23.
Once again, Google's argument ignores the Teamsters framework. As the Tenth Circuit reasoned in Thiessen , it is an abuse of discretion for this Court to ignore Plaintiffs' pattern-or-practice allegations in considering whether individual issues will predominate at trial. 267 F.3d at 1107. Although the defendants in Thiessen asserted "highly individualized" defenses to each alleged instance of intentional discrimination, "those defenses would not become the focal point until the second stage of trial and could be dealt with in a series of individual trials, if necessary." Id. At phase one of a Teamsters trial, the question is whether Google had a pattern or practice of age discrimination in place during the relevant period. None of the defenses cited by Google are relevant to the *1175 liability inquiry at phase one. The Court rejects Google's argument that its individualized defenses would need to be tried in a phase one trial as well as its contention that Plaintiffs' claims are not suited for a Teamsters trial at all. Reply at 14. Google's discussion of its individualized defenses, which ignores the distinction between phase one and phase two of the Teamsters framework, would lead to decertification in every case because a defendant could always jump to its phase two defenses before adjudication of liability at phase one.
Google's "legitimate, non-discriminatory reasons" for not hiring each Plaintiff, as well as its backpay and mitigation defenses are clearly issues for the remedial stage at phase two. Thiessen , 267 F.3d at 1106 (holding that at phase one the plaintiffs are "not required to offer evidence that each person for whom [they] will ultimately seek relief was a victim of the employer's discriminatory policy.") (citing Teamsters , 431 U.S. at 360, 97 S.Ct. 1843 ). These defenses may also be relevant to what damages each Plaintiff can recover, if any, which does not require decertification. Butler v. DirectSAT USA, LLC , 47 F.Supp.3d 300, 311 (D. Md. 2014) ("A collective action does not necessitate that there be no differences among class members, nor does it prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member.") Moreover, Google's defense that there is no evidence that a "substantially younger" applicant was selected for each position is irrelevant because Plaintiffs are not required to make such a showing in a Teamsters case. Rather, Plaintiffs may establish their prima facie case through circumstantial, statistical, or direct evidence that the failure to hire occurred under circumstances giving rise to an inference of age discrimination. See Carden v. Chenega Sec. & Prot. Servs., LLC , No. CIV. 2:09-1799 WBS, 2011 WL 1807384, at *5 (E.D. Cal. May 10, 2011) (quoting Rose v. Wells Fargo & Co. , 902 F.2d 1417, 1421 (9th Cir. 1990) ).
Plaintiffs argue that certain defenses may be relevant at phase one, but those defenses are common and not individualized. Opp'n at 17. In essence, Google's defense at phase one is to prove to the jury that there is no pattern or practice of age discrimination. Google can attempt to rebut Plaintiffs' prima facie case on this point by producing credible evidence that Plaintiffs' proof is inaccurate or statistically insignificant, or by proffering a nondiscriminatory explanation for any statistical discrepancy. See Buchanan , 2017 WL 6611653, at *12 (citing Teamsters , 431 U.S. at 360, 97 S.Ct. 1843 ). To do so, Google must demonstrate that curing the alleged flaws in Plaintiffs' statistical analysis would also cure the statistical disparity. Id. Google does not even attempt to argue that such phase one defenses would be individualized. Rather, Google argues that the evidence is too varied to allow the jury to determine that there was a pattern or practice at all. The Court is not persuaded that any of Google's potential defenses require individualized determinations at phase one. And permitting Google to decertify the class before phase one based on individualized defenses that are only applicable at phase two would improperly deprive Plaintiffs of the opportunity to prevail at phase one in order to trigger the presumption of discrimination at phase two. Thiessen , 267 F.3d at 1107. Accordingly, Google has not shown that its individualized defenses properly asserted in phase one outweigh the clear benefits to proceeding as a collective action at phase one.
This Court has the discretion to examine the relevant factors for maintaining a collective action, and the Court is not convinced *1176 that the prospect of individual defenses would render a phase one trial unmanageable. See Moss v. Crawford & Co. , 201 F.R.D. 398, 410 (W.D. Pa. 2000). As the district court reasoned in Rodolico , "[i]f, at a later point in the litigation, the Court finds that a collective action cannot accommodate the proposed individual defenses, the Court has the discretion to create subclasses or to dismantle the collective action." 199 F.R.D. at 484. For these reasons, the Court finds that evidence regarding the second Leuthold factor indicates that Plaintiffs are similarly situated.
3. Fairness and Procedural Considerations
Third and finally, the Court considers whether collective treatment is fair to both parties, as well as procedurally feasible, "keeping in mind Section 216(b)'s primary objectives of (i) lowering the burden on individual plaintiffs by pooling resources, and (ii) promoting judicial efficiency by resolving in one proceeding common issues of law and fact arising from the same cause of action." Sandoval , 2016 WL 6561580, at *11 (citing Hoffmann-La Roche, Inc. v. Sperling , 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) ). Google makes three arguments that maintaining this case as a collective action would be neither fair nor efficient. The Court has already considered and found unpersuasive two of Google's three arguments under this factor. First, Google argues that collective treatment raises due process concerns because the case would devolve into "mini-trials" due to the lack of representative testimony. Mot. at 23-24. Second, Google makes the contention-already rejected above-that pattern-or-practice claims are not cognizable under the ADEA, or alternatively, are irrelevant to the decertification analysis. Id. at 24-25. Similarly, the Court has already rejected Google's third argument that Plaintiffs' statistical evidence is flawed and not significant at decertification. Id. at 25. The Court therefore need only address Google's due process argument under the third Leuthold factor.
Contrary to Google's assertion, this case is unlike Benedict v. Hewlett-Packard Co. , No. 13-CV-00119-BLF, 2016 WL 3742342, at *11 (N.D. Cal. July 13, 2016). In Benedict , this Court decertified an FLSA collective action in part because Plaintiffs failed to meet their burden of demonstrating that collective members are "substantially similar such that certain Members could offer representative testimony to cover the experiences of all Members." Id. Importantly, the plaintiffs in Benedict did not proceed under a Teamsters pattern-or-practice framework, and Google's due process argument in this case is based in part on its flawed assumption that Teamsters does not apply at decertification.
The proposed Teamsters trial plan reduces any concerns regarding the jury's ability to review the evidence and determine Google's liability at phase one. For similar reasons to those discussed above, the jury need not "keep individual Plaintiffs straight" when hearing testimony, for example, that some candidates were rejected based on cultural fit while others had their professional experience ignored. See Reply at 15. The evidence regarding Plaintiffs' interview experiences does not conflict because Plaintiffs' theory is that Google's discriminatory hiring practice included at least five aspects-any one of which could have resulted in an older candidate not receiving an offer. When the five challenged aspects of Google's hiring process are considered in conjunction rather than disjunctively, there is little risk at phase one that an Opt-In Plaintiff's testimony would misrepresent the claims of *1177 others. Accordingly, the Court finds that Google's due process argument and the cases on which it relies are inapposite.
Plaintiffs persuasively argue that proceeding collectively would actually safeguard Plaintiffs' due process rights. Opp'n at 20. This is because the individual plaintiffs "are less able to bear the cost of separate trials because they have fewer resources" than Google and a collective action provides Plaintiffs with a fair and full opportunity to adjudicate their age discrimination claims. Glass v. IDS Financial Services, Inc. , 778 F.Supp. 1029, 1081-82 (D. Minn. 1991) (holding that a collective action is the most fair and efficient way to resolve the ADEA lawsuit in light of due process considerations). Because Plaintiffs have shown they were all subject to the same allegedly violative hiring policy during their on-site interviews at Google, and proceeding individually on their age discrimination claims would be too costly to be practical, the Court concludes that both procedural and fairness considerations weigh in favor of proceeding collectively. In any event, because the FLSA is a remedial statute that should be broadly construed, close calls regarding collective treatment should be resolved in favor of certification. Morgan v. Family Dollar Stores, Inc. , 551 F.3d 1233, 1265 (11th Cir. 2008) ; Falcon , 580 F.Supp.2d at 541.
The Court finds that judicial economy is best served by adjudicating the approximately 265 individual claims together under the Teamsters framework. Accord Vaszlavik , 175 F.R.D. at 680 ("Any disparities among the employment situations of the individual plaintiffs are irrelevant during the liability phase, judicial economies are clearly served by proceeding collectively, and the defendant is not prejudiced. This represents the epitome of similarly situated plaintiffs.") The Court reserves the right to reconsider its decision if Plaintiffs' trial plan becomes unmanageable. If Plaintiffs prevail on the liability phase, the Court can also revisit the issue of "whether the action should be dismantled for the remedial phase or whether appropriate subclasses can be crafted." Rodolico , 199 F.R.D. at 484. Therefore, the Court concludes that fairness and procedural considerations weigh against decertification at this stage.
IV. ORDER
Upon review of the significant discovery in this action, and based on its analysis of the three Leuthold factors, the Court finds that Plaintiffs have carried their burden to present substantial evidence demonstrating that the collective action members are similarly situated. Based on Plaintiffs' proposed Teamsters framework, phase one will adjudicate whether Google engaged in a pattern-or-practice of discrimination in violation of the ADEA as a result of its allegedly discriminatory hiring process. If Plaintiffs prevail at phase one, Google will have the opportunity to present its individualized defenses at the remedial phase two.
For the foregoing reasons, IT IS HEREBY ORDERED that Google's motion to decertify the collective action is DENIED.

In fact, "[i]t's almost ten times harder to get a job at Google than it is to get into Harvard." See Stan Phelps, Cracking Into Google: 15 Reasons Why More Than 2 Million People Apply Each Year , Forbes (Aug. 5, 2014), https://www.forbes.com/sites/stanphelps/2014/08/05/cracking-into-google-the-15-reasons-why-over-2-million-people-apply-each-year/#6c2df5f62038.

Google specifically argued in its motion to dismiss that Heath's disparate impact claim was not actionable because Section 4(a)(2) of the ADEA does not apply to applicants for employment and the claim can only be brought on behalf of existing employees. See ECF 16-1 at 1, 3-5.

On October 7, 2016, the Court adopted the parties' stipulated administrative modification to the time period in the class definition. See ECF 121.

For purposes of Google's motion to decertify, "Plaintiffs" refers to Fillekes and the Opt-In Plaintiffs only and does not include Heath.

These percentages are out of the original 100% of applicants. See Kotchen Decl. Exh. 2 at 10.

As discussed below, Plaintiffs provide evidence that Fillekes was asked for her graduation dates but the evidence pre-dates the relevant class period. See Kotchen Decl. Exh. 13-15.

Given the large volume of evidence in the record, both sides properly filed compilation exhibits summarizing the relevant evidence for the Court pursuant to Federal Rule of Evidence 1006, in addition to providing the underlying documents as exhibits.

The Court acknowledges that Google has done an impressive job of comprehensively picking apart the deposition testimony of 34 Opt-In Plaintiffs and interrogatory responses of 75 Opt-Ins with a fine-tooth comb. In addition to evidence regarding "Googleyness" and abstract interview questions, Google identifies virtually every way in which a Plaintiff differs from another with respect to each of the five aspects of the allegedly discriminatory policy including that: Plaintiffs do not similarly allege that Google discerned their ages, Plaintiffs do not share the same grievances about job levels, and Plaintiffs' claims about discounted professional experience differ. See Mot. at 15-17, 19. As discussed below, Google's arguments miss the mark.

Google does not address Dr. Neumark's report in its motion and only responds to his contentions in Google's reply brief.

Plaintiffs also provide evidence that Google's median age of 29 years old is significantly below the national labor market for comparable IT services.

As discussed but not decided in this Court's order granting Google's motion to dismiss the disparate impact claim, it is not clear from the statutory text of that ADEA that applicants for employment may even bring disparate impact claims. See ECF 235.